# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-30783

United States Court of Appeals
Fifth Circuit

**FILED**
August 9, 2018

Lyle W. Cayce
Clerk

MARK C. JAMES,

      Plaintiff - Appellant

v.

SAM WOODS; STEPHANIE WELBORN,

      Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JOLLY, JONES, and HAYNES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal—interwoven with a custody dispute—arrives in our court following a father's report of sexual misconduct inflicted on his child by the child's stepfather. Upon investigation by the St. Tammany Parish Sheriff's Office, the stepfather was arrested and charged with aggravated incest. A state-court jury ultimately acquitted him at trial, and he later filed these malicious-prosecution and intentional-infliction-of-emotional-distress claims under Louisiana law against the child's father and his then-girlfriend. The district court granted summary judgment for the father and girlfriend. For the reasons that follow, we affirm.

No. 17-30783

## I.

The parties dispute many of the facts in this emotionally charged matter. We recount only the facts relevant to our analysis, viewing all genuinely disputed facts in the light most favorable to the nonmovant.

Sam Woods and Tracy James ("Tracy") divorced in 2005. The custody agreement provided that their children, JW and AGW, live with Tracy in Mississippi. Tracy and Mark James ("James") began dating in 2006, and around the spring of 2007, Woods learned that Tracy and James planned to move the children to Louisiana. Woods filed a petition to modify the custody agreement. In November 2007, the Chancery Court denied Woods's request for the children to live with him in Mississippi but granted a modification of visitation rights. Throughout this custody dispute, Woods was dating Stephanie Welborn, to whom he is now married.[1] James believes that the events that followed the Chancery Court ruling were a ruse by Woods and Welborn to punish James and get custody of JW and AGW.

Sometime in 2008, eight-year-old AGW told Welborn that James touched her genitalia, which Welborn relayed to Woods shortly thereafter.[2] Woods and Welborn contacted the Mississippi Department of Human Services. There is also evidence indicating that they reported the allegations to the appropriate agency in Louisiana. On August 7, 2008, AGW, Woods, and Welborn visited with a licensed therapist, Shan'Terrica Barnes[3], and at this session, AGW told Barnes a story similar to what she told Welborn. AGW ended up going to

---

[1] The defendants' briefing inconsistently refers to "Welborn" and "Welborne." We adopt the spelling in the case caption.

[2] Woods later had AGW tell Tracy about the alleged touching. Tracy then made arrangements for AGW to move in with Woods.

[3] Barnes is also referred to in the record as Shan'Terrica Webb. The police report and the parties' briefing use the names interchangeably, and we have no reason to believe these are two individuals.

approximately sixteen sessions with Barnes. Some of the sessions included Woods, Welborn, and Tracy; but a majority of the sessions were conducted with AGW alone.

On October 14, 2008, Woods and Welborn told St. Tammany Parish Sheriff's Office ("STPSO") Detective Julie Downie about AGW's allegations, and Downie interviewed Welborn and AGW that same day. AGW told Downie that James had "touched her privates." On October 16, 2008, AGW underwent a forensic interview with JoBeth Rickels of the Children's Advocacy Center and told Rickels that James touched "her private." On November 7, 2008, STPSO Detective Rochelle Hartmann spoke with Barnes about her conversations with AGW.[4] Hartmann also had follow-up conversations with Welborn, but Hartmann's attempts to interview James were unsuccessful.

On November 10, 2008, Hartmann prepared an affidavit for an arrest warrant, stating that James committed aggravated incest. She based this conclusion on the following: (1) Woods's and Welborn's "walk-in complaint" to Downie; (2) AGW's statements to Downie regarding the alleged abuse; (3) the forensic interview Rickels conducted with AGW, and (4) the allegations AGW disclosed to Barnes. A magistrate judge issued a warrant for James's arrest that same day. James was subsequently charged with aggravated incest. A jury found him not guilty.

After his acquittal, James filed this suit, based on diversity jurisdiction, against Woods and Welborn ("the defendants") in Louisiana federal court. He alleges claims of malicious prosecution, intentional infliction of emotional distress, and alienation of affection under Louisiana law. After dismissing the alienation-of-affection claim under Rule 12(b)(6), the district court granted

---

[4] After James was arrested, Hartmann obtained a written summary of Barnes's findings.

No. 17-30783

summary judgment for the defendants on the malicious-prosecution and intentional-infliction-of-emotional-distress claims. The district court held that James's claims failed on the merits in addition to holding that the defendants had statutory immunity under Louisiana Children's Code Article 611. The district court denied James's Rule 59(e) motion to reconsider. James now appeals the dismissal of his malicious-prosecution and intentional-infliction-of-emotional-distress claims.[5]

## II.

This court reviews a grant of summary judgment de novo. *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 438 (5th Cir. 2012). "The party moving for summary judgment bears the burden of identifying the portions of the record that demonstrate the absence of a genuine issue of material fact," and "[t]he nonmovant must then point to or produce specific facts demonstrating that there is a genuine issue of material fact." *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009). We "draw all reasonable inferences in favor of the nonmoving party, and avoid credibility determinations and weighing of the evidence." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896 (5th Cir. 2002). We may affirm summary judgment "on any ground raised below and supported by the record." *Administaff Companies, Inc. v. New York Joint Bd., Shirt & Leisurewear Div.*, 337 F.3d 454, 456 (5th Cir. 2003).

Because our jurisdiction over this matter is based on diversity, we apply the substantive law of Louisiana. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

---

[5] James indicated in his notice of appeal that he was appealing the denial of his Rule 59(e) motion, but he mentions Rule 59 only in his briefing on oral argument and jurisdiction. Thus, he waives any appeal of that issue. *See Douglas W. ex rel. Jason D. W. v. Hous. Indep. Sch. Dist.*, 158 F.3d 205, 210 n.4 (5th Cir. 1998) ("[F]ailure to provide any legal or factual analysis of an issue on appeal waives that issue.").

No. 17-30783

III.

Because of the nature of the case and the focus of the arguments made on appeal, we begin by setting out the issue that we pretermit. This approach may be a little odd, but it seems the best way to get a grip on the case. A provision of the Louisiana Children's Code permits (and in some cases requires) an individual to file a report whenever there is "cause to believe that a child's physical or mental health or welfare is endangered as a result of abuse." LA. CHILD. CODE ANN. art. 609(A)(1), (B). And Article 611 provides, "No cause of action shall exist against any . . . [p]erson who in good faith makes a report, cooperates in any investigation arising as a result of such report, or participates in judicial proceedings under the provisions of this Chapter." *Id.* art. 611 (A)(1)(a). Thus, Woods and Welborn would have statutory immunity under Article 611 if they reported James's alleged abuse of AGW, and cooperated in the subsequent investigation and proceedings, in good faith. And thus the dispute that has dominated this appeal has been whether Woods and Welborn acted in good faith.

The term "good faith" is undefined in the relevant statutes, and we find no Louisiana Supreme Court case analyzing good faith in the context of Article 611.[6] At oral argument, the parties themselves failed to take a definitive position on what good-faith standard should be applied here. But even if we were to agree with James that the district court erred in holding that Article 611 gives the defendants immunity—on which we take no position—remand would be futile with respect to the merits of the sole claim properly briefed to us. Thus, we do not reach that state-law statutory issue and proceed directly

---

[6] At oral argument, James's counsel conceded that "all we have to go on" is the standard articulated in *Parker v. Venture, Inc.* by a federal district court. No. 95-CV-969, 1996 WL 39415, at *3 (E.D. La. Jan. 30, 1996) ("Unless there is proof that this report was made with knowledge that the information was false or with reckless disregard whether it was false, this Court must find that the report was made in good faith.").

No. 17-30783

to the underlying merits of James's malicious-prosecution claim.  *See Allen v. Ferguson*, 791 F.2d 611, 615 (7th Cir. 1986) ("Of course, in keeping with the notions of judicial restraint, federal courts should not reach out to resolve complex and controversial questions when a decision may be based on a narrower ground.").

IV.

In order to survive summary judgment, James must establish the essential elements of his malicious-prosecution claim:

> (1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendant[s] in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damage conforming to legal standards resulting to the plaintiff.

*Jones v. Soileau*, 448 So. 2d 1268, 1271 (La. 1984).  The central issue here is legal causation, which requires that the defendants "have caused the prosecution" of James.  *LeBlanc v. Pynes*, 69 So. 3d 1273, 1281 (La. Ct. App. 2011).  We observe at the start:  malicious-prosecution actions are "[n]ever favored in [Louisiana] law."  *Kennedy v. Sheriff of E. Baton Rouge*, 935 So. 2d 669, 690 n.20 (La. 2006).

In addressing the causation element, we rely on Louisiana law for this state-law cause of action.  There, we find that merely reporting an individual to law enforcement for a suspected crime may cause that individual's prosecution if, after reporting the crime, there is no subsequent police investigation.  In *Craig v. Carter*, the plaintiff was arrested at a grocery store, "at the instigation of [the grocery's employees]," for disturbing the peace and false impersonation.  718 So. 2d 1068, 1070 (La. Ct. App. 1998).  A Louisiana appellate court found sufficient evidence of causation to support a malicious-prosecution claim against the grocery and its employees where the "record

6

show[ed] broad reliance on the facts provided by the [employees] and only limited independent inquiry by the police." *Id.* at 1070–71; *see also LeBlanc*, 69 So. 3d at 1281 (finding evidence of causation where arrest and charges were "based solely" on the information provided by defendants). There, the police found probable cause to arrest the plaintiff after interviewing only the grocery employees, conducting no further investigation into the matter. *Craig*, 718 So. 2d at 1070.

Where, however, a report of suspicious conduct is followed by an independent law-enforcement investigation, the chain of causation between that initial report and the ultimate prosecution may be broken; that is to say, merely reporting the crime may not satisfy the requirement that the defendant have *caused* the prosecution. *LeBlanc*, 69 So. 3d at 1281. For example, in *Kennedy v. Sheriff of East Baton Rouge*, the Louisiana Supreme Court found there was no legal causation to support a malicious-prosecution claim where the "decision to detain plaintiff was made by the independent actions and investigation of the Sheriff's Office" and the defendants "merely reported their suspicions . . . to the Sheriff's Office." 935 So. 2d at 690 n.20; *see also Banks v. Brookshire Bros.*, 640 So. 2d 680, 682 (La. Ct. App. 1994) (finding no causation where "defendants merely reported their observations to police officers").

Importantly, in order to break the chain of causation, law enforcement's investigation must be independent of any individual suspicions. In *Adams v. Harrah's Bossier City Investment Co., L.L.C*, the defendants reported a suspected theft to police and then viewed security footage alongside the police to point out the suspected theft. 948 So. 2d 317, 320 (La. Ct. App. 2007). The Louisiana Court of Appeals held that the police's viewing of the security footage, although it occurred with the assistance of the defendants, was a sufficiently independent investigation to break the chain of causation because the defendants' involvement "d[id] not rise to such a level as to prevent the

No. 17-30783

police investigation from being independent of [defendant's] own suspicions."
*Id.*[7]

V.

As we have earlier noted, the defendants here moved for summary judgment on the malicious-prosecution claim, arguing that the independent investigation by the STPSO broke the chain of causation between the defendants' report of suspected abuse and James's criminal proceedings. The district court agreed.

On appeal, James argues that because the police report shows that, after the initial report was filed, Welborn gave STPSO detectives "incomplete and misleading" information[8], there is a question of fact as to whether the STPSO conducted an investigation independent of the defendants' suspicions.

Here is what we know from the record: The defendants' involvement in the STPSO's investigation did not end with their report of suspected abuse. Welborn, on more than one occasion, offered STPSO detectives information regarding AGW. But here is what we also know: STPSO detectives spoke with other professionals who had interacted with AGW to gather additional information. Furthermore, Detective Hartmann's arrest-warrant affidavit, in swearing that James was guilty of aggravated incest, did not rely on Welborn's follow-up information *at all*. Instead, aside from the defendants' initial

---

[7] Furthermore, a Louisiana appellate court, after initially referring to good faith in its causation analysis, concluded that "an independent investigation . . . is the *critical* factor that prevents Plaintiffs from proving legal causation on any of their claims." *Adams*, 948 So. 2d at 320–21 (emphasis added). Indeed, the Louisiana Supreme Court has declined to consider good faith in the context of the malicious-prosecution causation element. *See, e.g.*, *Kennedy*, 935 So. 2d at 690 n.20. Thus to determine whether the chain of causation is broken, we ask only whether the STPSO reasonably investigated the charges against James, independent of the defendants' claims.

[8] Specifically, the police report shows that Welborn told Detective Hartmann details of AGW's physical condition that, according to James, are suggestive of physical abuse. In James's view, the simple presence of this information in the police report shows that the STPSO investigation was not independent of the defendants' suspicions.

complaint to the police, Detective Hartmann based her findings on: (1) AGW's statements to Detective Downie; (2) AGW's statements to Rickels at the Children's Advocacy Center, and (3) AGW's statements to her therapist, Barnes. Each of those individuals are entirely removed from the custody dispute infecting this litigation.

Thus, unlike the police in *Craig* who relied solely on the defendant's allegations in detaining the plaintiff, the record here does not support the argument that STPSO relied only on the information provided by Woods and Welborn in arresting James. It is also clear that the STPSO's decision to arrest James rested on the story as told by someone much more central to the incident: AGW. And as explained in *Adams,* the simple fact that Welborn interacted with STPSO detectives during the investigation does not rob the investigation of its independence. This is especially so where it does not appear that the STPSO relied on Welborn's information in deciding to get a warrant for James's arrest. In sum, we hold that the independent investigation conducted by the STPSO broke the chain of causation between the defendants' complaint and the criminal proceedings initiated against James. The district court did not err in granting summary judgment on the malicious-prosecution claim.

## VI.

We now turn to James's claim of intentional infliction of emotional distress ("IIED"). To survive summary judgment, James must show:

> (1) that the conduct of the defendant[s] was extreme and outrageous; (2) that the emotional distress suffered by [him] was severe; and (3) that the defendant[s] desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from [their] conduct.

*White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991). The district court held that James failed to create a genuine dispute as to whether the

defendants' conduct was extreme and outrageous.   We have noted that "'[e]xtreme and outrageous' conduct is difficult to define," *Johnson v. Merrell Dow Pharm., Inc.*, 965 F.2d 31, 33 (5th Cir. 1992), so parties must be clear in arguing how those standards are satisfied.

On appeal, James says—citing only to the district court's order holding that he *stated a claim* of IIED—that the facts speak for themselves: his life was ruined.   That conclusory argument does not satisfy the requirements of this court, especially from represented parties.   *Cf. United States v. Posada-Rios*, 158 F.3d 832, 867 (5th Cir. 1998) (holding issue was waived where appellant cited only documents filed in the district court and failed to brief any "argument or discussion of the facts explaining why the district court's findings were incorrect").   Federal Rule of Appellate Procedure 28(a)(4) states that an appellant's brief "must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies."   James's IIED briefing lacks citation to both case law and evidence.   *See United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir. 1994) (per curiam) ("Failure to comply with the rules of this court regarding the contents of briefs can be grounds for dismissing a party's claims.").   Indeed, James did not list the district court's summary-judgment ruling on his IIED claim as an issue presented to us for review.[9]

---

[9] We copy the entirety of James's briefing on his IIED claim here:

As the district judge summarized in earlier denying the Woods 12(b)(6) motion, "the claim in this case is that Defendants ruined James' life by falsely accusing him of aggravated incest, a horrible and despicable crime, for the sole purpose of [ ] leverage in a custody battle. [James'] opposition states the point rhetorically yet well: If this does not state a claim for IIED in Louisiana then how much more egregious would the facts have to be?" [Record Citation to District Court Opinion]. In this context, the same record and necessary inferences, which make malicious prosecution probable cause a jury issue for a jury, also make IIED's central element of malice an issue which the district judge couldn't dispose of on summary judgment.

No. 17-30783

The insufficiency of James's briefing on this point is a particularly critical failing considering the nature of the claim we address. A Louisiana court has explained that "[o]utrageous conduct is a nebulous concept, as it does not refer to any specific type of conduct." *Perrone v. Rogers*, 234 So. 3d 153, 158 (La. Ct. App. 2017). In order to determine whether conduct is extreme and outrageous, we ask whether, as a matter of law, the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *White*, 585 So. 2d at 1209. James offers no explanation of how the specific facts of this case support his legal claim of IIED. In other words, he does not apply the law to the facts. And his argument that the defendants' accusations "ruined [his] life," while certainly very sad, and even tragic in the context of his life, does not help us decide that hard legal question, made even harder by the fact that AGW has maintained her serious allegations against James from the beginning to the end.

We do not address further James's IIED claim because of his failure to explicate the facts of this case, with appropriate citations in his briefing. *See Yohey v. Collins*, 985 F.2d 222, 224 (5th Cir. 1993).

VII.

We sum up: In order for the malicious-prosecution claim to survive summary judgment, James must offer evidence tending to show that the defendants caused his prosecution. James's proffered evidence belies this assertion of causation; that is, the evidence shows that the STPSO conducted an independent investigation of the alleged abuse. Furthermore, STPSO did not base the decision to arrest James simply on the information provided by the defendants. For these reasons, the district court did not err in dismissing the malicious-prosecution claim. And although James further contends that the district court improperly dismissed his IIED claim, he offers only cursory

No. 17-30783

reference to the contention. Neither does he provide record or case citations to show how the district court erred. And consequently, we do not consider this claim. Finally, we note that we have pretermitted addressing good faith in this opinion, especially as it relates to Article 611 of the Louisiana Children's Code.

Accordingly, we end this opinion by holding that the judgment of the district court is

AFFIRMED.